(146 P.3d 1088)
No. 95,544

LDF FOOD GROUP, INC., *Appellee*, v. LIBERTY MUTUAL FIRE INSURANCE COMPANY and LIBERTY MUTUAL INSURANCE COMPANY, *Appellants*.

Opinion filed November 17, 2006.

*Patrick J. Murphy*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, for appellants.

*Eric B. Metz* and *Jerald W. Rogers*, of Triplett, Woolf & Garretson, L.L.C., of Wichita, for appellee.

Before RULON, C.J., GREENE and HILL, JJ.

GREENE, J.: LDF Food Group, Inc. (LDF) initiated this insurance coverage and failure to defend litigation against both Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (referred to collectively as Liberty Mutual), after Liberty Mutual refused to defend a suit filed against LDF by a former LDF employee who purportedly suffered emotional damage after being strip-searched by LDF managerial personnel. The search was prompted by what turned out to be a prank phone call that LDF management believed was from law enforcement authorities. Liberty Mutual appeals the district court's summary judgment

against them, which concluded that coverage was provided by LDF's policies of insurance. We disagree with the district court's conclusions, reverse the district court, and remand with directions to enter summary judgment against LDF.

### Factual and Procedural Background

LDF was insured by Liberty Mutual pursuant to both a commercial general liability insurance policy (CGL policy) and a workers compensation/employer's liability insurance policy (WC/EL policy) for occurrences during 2003. The material provisions of these policies will be quoted or discussed in our analysis below.

In November 2003, LDF received a demand letter and a draft petition from counsel for former female employee (Fields) alleging that supervisory personnel at an LDF restaurant accused Fields of criminal activity based on an alleged phone call from local law enforcement suggesting that the employee might be in possession of contraband. The employee was required to submit to a strip search, was forced to remove all her clothes, including her bra and panties, and was then told to jog in place in the presence of one female manager and two male managers. It was later discovered that the call provoking the search was from a prank caller.

On November 18, 2003, LDF forwarded a copy of Fields' demand letter and draft petition to Liberty Mutual, together with a request to advise as to coverage under LDF's insurance policies.

On December 2, 2003, Fields filed her lawsuit against LDF in Rogers County, Oklahoma, making claims for invasion of privacy, assault, intentional infliction of emotional distress, civil conspiracy, false imprisonment, prima facie tort, defamation, negligent hiring or training, and constructive discharge, and seeking damages for emotional injury. A copy of this petition was forwarded to Liberty Mutual together with additional information including the official police report and witness statement. Nowhere in the information provided by LDF to Liberty Mutual did Fields allege or claim a physical injury.

Liberty Mutual denied coverage to LDF under both the WC/EL policy and the CGL policy, citing policy indemnity provisions, definitions, and exclusions. LDF and Liberty Mutual continued to

correspond over the next few months, with LDF asserting that Liberty Mutual owed it a defense and indemnification, and Liberty asserting that LDF had no coverage. LDF forwarded updated copies of Fields' petition to Liberty Mutual as they were received, and the case was ultimately removed to federal court.

Meanwhile, LDF hired counsel and a private investigator and proceeded to defend the lawsuit. On April 22, 2004, Liberty Mutual was invited to attend a settlement conference, but refused to participate. A settlement was reached, at that conference, and Fields' suit was dismissed.

LDF then filed this action against Liberty Mutual alleging that it failed to adequately investigate whether LDF had coverage under its policies and that it owed LDF a defense and indemnity. LDF asserted that its damages totaled $194,978.60, including $100,000 paid in settlement, attorney fees, and other litigation expenses.

The parties cross-filed motions for summary judgment. After briefing and argument, the district court granted summary judgment in favor of LDF, concluding that there was coverage under both Liberty Mutual policies of insurance and a breach of the duty to defend and indemnify. Judgment was awarded against Liberty Mutual in the amount of $235,767.36, plus fees and expenses after October 1, 2005. Liberty timely appeals.

### Standards of Review

On appeal of a district court's summary judgment, we apply the same rules as the district court. *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995). Those rules are well established by K.S.A. 60-256, Rule 141 (2005 Kan. Ct. R. Annot. 205), and related case law and need not be repeated here. See, *e.g., Klose v. Wood Valley Racquet Club, Inc.*, 267 Kan. 164, 166-67, 975 P.2d 1218 (1999).

As a general rule, all issues related to the interpretation and construction of written instruments, including insurance policies, present questions of law exclusively for the court. *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, 311, 856 P.2d 111 (1993). Regardless of the interpretation or construction given a written

contract of insurance by the district court, we may interpret or construe a written contract and determine its legal effect independent of the conclusions of the district court. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998); *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 240, 865 P.2d 182 (1993).

There are several fundamental legal principles applicable to the interpretation and construction of insurance contracts. See, *e.g.*, *First Financial*, 265 Kan. at 694-97. To the extent applicable to our analysis, such principles will be cited and discussed below.

Liberty Mutual suggests heightened appellate scrutiny of the district court's findings and conclusions because they were merely a "mechanical adoption" of LDF's proposed findings and conclusions. We agree that this is not a practice to be encouraged. See *Steve v. City of Kiowa*, 263 Kan. 502, 506, 950 P.2d 1305 (1997); *Ortiz v. Biscanin*, 34 Kan. App. 445, 454-55, 101 P.3d 253 (2004). Independent consideration and judgment in determining findings and conclusions in deciding summary judgment motions are the essence of the judicial function and should not be delegated to counsel. See *Sierra Club, Lonestar Chap. v. Cedar Point Oil*, 73 F.3d 546, 574 (5th Cir. 1996).

### *Did Coverage A of Liberty Mutual's CGL Policy and Applicable Exclusions Trigger a Duty to Defend the Suit Against LDF?*

The basic insuring agreement for coverage A within the CGL policy provides as follows:

"We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that my result."

The term "bodily injury" is defined by an endorsement to the policy to include mental anguish resulting from physical harm.

" 'Bodily injury' means bodily injury, sickness or disease sustained by a person. It includes death or mental anguish which results at any time from such physical

harm, physical sickness or physical disease. Mental anguish means any type of mental or emotional illness or distress."

The term "occurrence" is defined by the policy as follows:

" 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policy contains three relevant exclusions:

"Expected or Intended Injury. 'Bodily injury' or 'property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to 'bodily injury' or 'property damage' resulting from the use of reasonable force to protect persons or property."

"Employment-Related Practices Exclusion. . . . This insurance does not apply to: 'bodily injury' to:
  (1) A person arising out of any:
    . . . .
    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;
  . . . .

This exclusion applies:
(1) Whether the insured may be liable as an employer or in any other capacity."

"Employers' Liability. [This insurance does not apply to:] 'Bodily injury' to:
  (1) An 'employee' of the insured arising out of and in the course of:
    (a) Employment by the insured; or
    (b) Performing duties related to the conduct of the insured's business;
  . . . .
This exclusion applies:
  (1) Whether the insured may be liable as an employer or in any other capacity."

LDF argues on appeal that coverage under the CGL policy is most clear under coverage B, "personal and advertising injury," but argues that coverage A also applies to this incident. Liberty Mutual argues that coverage A does not apply because there was no "bodily injury" nor was there an "occurrence."

With regard to the requirement of a "bodily injury," Liberty Mutual asserts and LDF does not dispute that Fields never claimed or sought damages for physical harm, but rather restricted her

damage claims to emotional distress. The parties agree that pure emotional injury does not constitute bodily injury. See *Lapeka, Inc. v. Security Natl. Ins. Co.*, 814 F. Supp. 1540, 1548-49 (D. Kan. 1993). Examining information provided to Liberty Mutual by LDF, including the official police report of the incident, correspondence among counsel, the initial demand letter, and the petition filed (all of which were purportedly reviewed by Liberty Mutual in its initial coverage analysis), it does not appear to this court that Fields ever suffered, alleged, or claimed any "physical harm, physical sickness, or physical disease." LDF argues that notwithstanding these facts, Liberty Mutual should have undertaken an investigation to determine whether Fields had in fact suffered physical manifestations from her emotional distress which would thereby qualify as "bodily injury" for purposes of the policy, citing *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 686, 512 P.3d 403 (1973).

*Spruill Motors* does not support LDF's argument. Although an insurer may not rely on the allegations of the petition alone, our Supreme Court made clear that there must be known or discoverable facts giving rise to a potential of liability. The court stated:

"We adopt the rule in *Milliken* [*v. Fidelity and Casualty Company of New York*, 338 F.2d 35 (10th Cir. 1964)] that an insurer must look beyond the effect of the pleadings and must consider any facts brought to its attention or any facts which it could reasonably discover in determining whether it has a duty to defend. If those facts give rise to a 'potential of liability' under the policy, the insurer bears a duty to defend. . . . The possibility of coverage must be determined by a good-faith analysis of all information known to the insured or all information reasonably ascertainable by inquiry and investigation." 212 Kan. at 686.

Here, there were no facts made known to Liberty Mutual that Fields suffered or claimed physical harm, nor does LDF cite this court to any fact that was reasonably discoverable indicating that physical harm was at issue at any time from the date of incident until the settlement. Although an insurer may not rely solely on the formal pleadings in determining its duty to defend, mere conjecture or imagined facts do not support a duty to defend. If we adopted LDF's reasoning, virtually every claim asserted would trigger a duty to investigate.

Although our conclusion as to "bodily injury" supports Liberty Mutual's decision to decline a defense and indemnity on coverage A, we also believe that the incident did not constitute an "accident" so as to trigger coverage. The term "accident" as employed in insurance contracts has been discussed in numerous appellate decisions in Kansas, and our courts have consistently stated that it should have its ordinary, common meaning.

"The word accident does not have a settled legal signification. It does have, however, a generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language. An accident is simply an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force." *Harris v. Richards*, 254 Kan. 549, 553, 867 P.2d 325 (1994).

LDF fails to respond to this particular argument on appeal, but in adopting LDF's proposed findings and conclusions, the district court appears to base its conclusion of "occurrence" solely on a purported admission contained in a Liberty Mutual letter declining to defend. We disagree, noting that the letter itself stated only that these circumstances "may very well constitute an 'occurrence'" and Liberty Mutual made no such admission as a part of the summary judgment proceedings. See Rule 141.

The court views this incident as a deliberate, calculated scheme to investigate fully the ostensible allegations that an employee possessed contraband. We do not view the events as "undesigned, sudden, and unexpected" but rather as intentional from the perspective of LDF managerial employees. Employing the logic adopted in *Harris v. Richards*, it would seem to us that when male and female supervisors accuse an employee of possessing contraband and then demand that the employee strip and jog in place in their presence, any emotional injury caused thereby is not an accident, but rather intended. See *Harris*, 254 Kan. at 554; *Spruill Motors*, 212 Kan. at 684.

Because we have concluded that there was neither an "occurrence" nor "bodily injury" as defined by the CGL policy, we decline to analyze whether any of the policy exclusions apply. We note, however, that if bodily injury had been claimed, the incident was probably excluded by all three of the express exclusions quoted

above. See *Rockgate Management Co. v. CGU Ins. Inc.*, 32 Kan. App. 2d 743, 88 P.3d 798 (2004). We conclude that there was no possibility of liability under coverage A of Liberty Mutual's CGL policy and that the insurer did not breach the policy in its decision to decline a defense to the insured. The district court erred in concluding otherwise.

## Did Coverage B of Liberty Mutual's CGL Policy and Applicable Exclusions Trigger a Duty to Defend the Suit Against LDF?

The basic insuring agreement for coverage B within the CGL policy provides:

"We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. . . .

"This insurance applies to 'personal and advertising injury' caused by an offense arising out of your business . . . ."

"Personal and advertising injury" is defined as

"a. Injury, including consequential 'bodily injury', to the feelings and reputation of a natural person (including mental anguish) caused by an offense arising out of your business . . . .

"b. injury, including consequential 'bodily injury', arising out of one or more of the following offenses:

(1) False arrest, detention or imprisonment . . . ."

The policy contains three relevant exclusions.

"Knowing Violation of Rights of Another. [This insurance does not apply to:] 'Personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'

. . . .

"Intentional Injury. [This insurance does not apply to:] 'Personal and advertising injury' arising out of an offense committed by or at the direction of the insured for the purpose of causing injury.

"Employment-Related Practices Exclusion. . . . This insurance does not apply to: 'Personal and advertising injury' to:

(1) A person arising out of any:

. . . .

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity."

As referenced above, LDF claims that its strongest argument for coverage is under coverage B of the CGL policy. LDF emphasizes that the insuring agreement expressly includes within the definition of "personal and advertising injury" injuries arising out of "false arrest, detention or imprisonment." Indeed, the original petition filed by Fields included such claims, but we do not view this as conclusive on the issue of policy coverage.

Liberty Mutual argues that coverage B was not triggered because the injury arose from an employment-related practice as defined in and excluded by the policy. This argument is articulated in their brief on appeal as follows:

"[t]he offending acts excluded do not have to be practices, nor do they have to be the subject of an employer's policies. Rather, a single act or omission, as described in the exclusion, is sufficient to preclude coverage. The exclusion applies to any 'acts . . . such as . . . coercion . . . harassment . . . or humiliation.' Ms. Fields unquestionably alleged acts by plaintiff's manager employees which were coercive, harassing and humiliating. The exclusion, although referred to as the employment-related practices exclusion, simply does not require that those unfortunate acts rise to the level of a practice or policy. According to the plain language of the exclusion, the acts causing humiliation are, themselves, excluded from coverage."

LDF argues that it had no employment-related practice or policy to strip-search employees, thus a liberal construction of the exclusion requires that this incident was not excluded, citing *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992). We agree with Liberty Mutual, however, in concluding that there need not be a showing of employment-related "practice" or "policy" as a prerequisite to the applicability of this exclusion. The language of the exclusion is not restricted to employment-related practices and policies but expressly includes employment-related

"acts or omissions," and goes on to expressly include both harassment and humiliation. Moreover, the exclusion expressly applies "[w]hether the insured may be liable as an employer or in any other capacity."

Both parties cite cases from other jurisdictions interpreting similar exclusion language from insurance contracts. We do not find these authorities persuasive, however, and rely instead on the well-established principles that the clear language of the contract controls and judicial interpretation should not render any term meaningless. *Marshall v. Kansas Med. Mut. Ins. Co.*, 276 Kan. 97, Syl. ¶ 11, 73 P.3d 120 (2003) (policy language must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used); *Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 180, 660 P.2d 1374 (1983) (interpretation results which eliminate terms of the contract should be avoided). If we were to require an employment-related "practice" or "policy" to be shown for this exclusion to apply, we would render meaningless the reference to employment-related "acts or omissions."

We conclude that coverage B of the CGL policy was not triggered due to the applicability of the express exclusion for employment-related acts and omissions charged against LDF as an employer. There was simply no possibility of liability under coverage B of Liberty Mutual's CGL policy, and the insurer did not breach the policy in its decision to decline a defense to the insured. The district court erred in concluding otherwise.

### Did Liberty Mutual's WC/EL Policy and Applicable Exclusions Trigger a Duty to Defend the Suit Against LDF?

The basic insuring agreement under the WC/EL policy provides in material part:

"This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you."

Among the express exclusions is the following:

"This insurance does not cover:

. . . .

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions."

Because this policy covers only "bodily injury" and excludes personnel "acts or omissions," our analysis need not belabor this opinion. We have already concluded that Fields neither suffered nor claimed bodily injury, and that Fields' damages arose from an employment-related act or omission, which we perceive as identical to a "personnel" "act or omission." Consequently, we conclude that coverage under the WC/EL policy was not triggered and that the insurer did not breach the policy in its decision to decline a defense to the insured. The district court erred in concluding otherwise.

### *Summary and Conclusion*

We have carefully examined LDF's insurance policies and concluded that the strip search incident was not covered under any of these policies. For this reason, we reverse the district court and remand with directions to enter judgment against LDF on its claims against Liberty Mutual.

Reversed and remanded with directions.